**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| JILL K. JINKS, INDIVIDUALLY AND AS TRUSTEE OF THE JINKS HERITAGE TRUST,<br><br>　　Plaintiff,<br><br>v.<br><br>SEA PINES RESORT, LLC, COMMUNITY SERVICES ASSOCIATES, INC., ASSOCIATION OF SEA PINES PLANTATION PROPERTY OWNERS, INC. AND THE ADVISORY BOARD,<br><br>　　Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    Case No.:    9:21-cv-00138-DCN |

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES

Plaintiff Jill K. Jinks, individually and as Trustee of the Jinks Heritage Trust ("Plaintiff" or "Jinks"), by and through the undersigned counsel of record, individually and derivatively on behalf of Community Services Associates, Inc. ("CSA"), files this Verified Complaint for Declaratory Relief, Injunctive Relief, and Damages (the "Complaint") against Defendants CSA, Sea Pines Resort, LLC (the "Resort"), and the Association of Sea Pines Plantation Property Owners, Inc. and the Advisory Board ("ASPPPO"), stating as follows:

## PRELIMINARY STATEMENT

Sea Pines Plantation is a master-planned gated community located on Hilton Head Island, South Carolina. Sea Pines Plantation is comprised of residential properties, commercial properties, and the Sea Pines Resort, as well as golf courses, tennis courts, biking and leisure trails, and beach access. The rights and responsibilities of the property owners within Sea Pines Plantation are governed by various recorded declarations and covenants, including, but not limited to, the

1

Declaration of Covenants and Restrictions dated September 7, 1974 that is recorded at Deed Book 224, Page 1036 in the Beaufort County, South Carolina Register of Deeds (the "1974 Covenants"). At the heart of this lawsuit is a referendum calling for a vote on a proposed amendment to the 1974 Covenants which, if approved and implemented, would result in a substantial modification to the 1974 Covenants.  Specifically, the proposed amendment imposes a new annual assessment upon all the residential property owners of Sea Pines Plantation, including Plaintiff Jinks. This assessment would be in addition to the annual assessment that is already paid by the residential property owners into the Community Fund—and it amounts to tens of millions of dollars over its lifetime.

The referendum is unlawful and procedurally invalid, for numerous reasons.  Accordingly, Plaintiff seeks to enjoin Defendants CSA, the Resort, and ASPPPO from conducting the referendum and from implementing the results that would effectuate an amendment of the 1974 Covenants.[1]  Plaintiff also seeks a declaration from this Court that the proposed amendment to the 1974 Covenants is invalid and unenforceable based upon the erroneous assertion that the Resort is the successor-in-interest to Sea Pines Plantation Company, Inc., as it is not.  Plaintiff further seeks a declaration that CSA lacks legal authority to call for the subject referendum or to implement the referendum.  Lastly, Plaintiff seeks monetary damages against CSA, ASPPPO, and the Resort based upon their actions undertaken in violation of various recorded covenants and declarations governing the Sea Pines Plantation residential community.

---

[1] In conjunction with the filing of this Verified Complaint, Plaintiff Jinks will be filing an Emergency Motion for Preliminary Injunctive Relief seeking an immediate injunction to preserve the status quo and prevent irreparable harm to Jinks and the other property owners in Sea Pines Plantation.

## PARTIES

1.

Plaintiff is the owner of certain residential real property in the Sea Pines Plantation community located at 53 Heritage Road, Hilton Head, SC 29928. Jinks is a citizen and resident of the State of Georgia and a member of CSA. For the purposes of this Complaint, Plaintiff is also a representative of CSA and is pursuing certain causes of action herein both on her own behalf and on behalf of CSA and against CSA, ASPPPO, and the Resort.

2.

The Resort is a limited liability company organized and existing under the laws of the Commonwealth of Virginia with its principal office located at 800 East Cary Street, Suite 1900, Richmond, Virginia 23219. The Resort can be served with process through its registered agent, National Registered Agents, Inc., located at 2 Office Park Court, Suite 103, Columbia, South Carolina, 29223.

3.

Upon information and belief, none of the members of the Resort are citizens of and/or are domiciled in the State of Georgia.

4.

CSA is a nonprofit corporation organized and existing under the laws of the State of South Carolina with its principal office located at 175 Greenwood Drive, Hilton Head Island, South Carolina 29928. CSA can be served with process through its registered agent, Bret Martin, located at 175 Greenwood Drive, Hilton Head Island, South Carolina 29928.

5.

ASPPPO is a nonprofit corporation organized and existing under the laws of the State of South Carolina with its principal office located at 175 Greenwood Drive, Hilton Head Island, South Carolina 29928.  ASPPPO can be served with process through its registered agent, Bret Martin, located at 175 Greenwood Drive, Hilton Head Island, South Carolina 29928.

## JURISDICTION AND VENUE

6.

Jurisdiction is vested in this Court pursuant to this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332, as Plaintiff is domiciled in Georgia and none of the named defendants in this action are citizens of or are domiciled in Georgia.

7.

The amount in controversy exceeds $75,000.00, as the proposed annual assessment at issue in this action is projected by CSA to generate approximately $3.5 million annually.[2]

8.

Venue is appropriate in the Beaufort Division of this Court because the property at issue is located in this district and certain of the acts and omissions alleged took place on Hilton Head Island, Beaufort County, South Carolina.

## BACKGROUND

9.

Sea Pines Plantation is a gated community that occupies over 5,000 acres on Hilton Head Island, Beaufort County, South Carolina.

---

[2] https://www.seapinesliving.com/sea-pines-referendum/ (last accessed January 11, 2021).

10.

Sea Pines Plantation is made up of residential and commercial ownership interests, including the Sea Pines Resort that is owned and operated by Defendant Resort, as well as thousands of residential homes and villas that are privately owned.[3]

11.

The Resort owns and operates the Sea Pines Resort located within Sea Pines Plantation.

12.

CSA is a nonprofit corporation formed in 1987, whose responsibilities include the ownership and maintenance of certain community properties on Sea Pines Plantation for the benefit of the residential and commercial property owners of Sea Pines Plantation.

13.

ASPPPO is a nonprofit corporation formed in 1973, whose stated mission is to provide a forum for and to promote the common good and general welfare of residential property owners on Sea Pines Plantation and to represent residential property owners in all matters in pursuit of these objectives.[4]

14.

Plaintiff is the owner of certain residential property located in the Sea Pines Plantation community. Jinks is a member of CSA and ASPPPO.

---

[3] https://www.hiltonheadisland.com/relocation/communities/ (last accessed January 11, 2021).

[4] https://aspppo.net/about-us/ (last accessed January 11, 2021).

## THE 1974 DECLARATION OF COVENANTS AND RESTRICTIONS

15.

On September 7, 1974, the then-owner and developer of the Sea Pines Plantation community, Sea Pines Plantation Company, Inc. (the "Company") executed the 1974 Covenants to govern certain rights and obligations of the Company and the various property owners within the Sea Pines Plantation community.  A true and correct copy of the 1974 Covenants is attached hereto as Exhibit A and incorporated herein by reference. Plaintiff, and every property owner within Sea Pines Plantation, has a vested property interest in the provisions of the 1974 Declaration, and in the enforcement thereof.

16.

Article III of the 1974 Covenants provides, in pertinent part, as follows:

Community Fund.  In order to provide a community fund to maintain, and improve the Properties, provide a fund for pest and insect control, and generally provide a fund for those services important to the maintenance and preservation of an attractive community, and to maintain the general safety of the Sea Pines Plantation, each Participating Property Owner shall pay to the Company, or its authorized agent, beginning with the calendar year 1975, an annual community service assessment as delineated herein:

A.     Properties not owned by the Company

    1.     Residential Lots:  $110.00 per lot

Property shall be classified for purposes of these Covenants and these Annual Assessments as a Residential Lot when it is platted as a Residential Lot and such plat is recorded in the Office of the Clerk of Court of Beaufort County, South Carolina.

    2.     Family Dwelling Unit:  $180.00 per unit

For purposes of these Covenants and these Annual Assessments, any Participating Property Owner[5] who has constructed a Family Dwelling Unit on two (2) or more

---

[5] A "Participating Property Owner" is defined under the 1974 Covenants as "all those owners of Residential lots, and Family Dwelling Units, except the Company, who execute that certain Agreement, known as the 'Advisory Group Agreement', and all owners of Residential lots and Family Dwelling Units who purchase

contiguous Residential Lots shall be assessed only the Assessment for a Family Dwelling Unit.

In determining the amount of the annual Community Services assessment for any current year, the Company may, in its discretion, set an amount different from the immediately preceding year's annual Community Services assessment by as much as the percentage of change in the Consumer Price Index All Items – All Groups (1967 = 100) in the immediately preceding calendar year. The maximum amount of each change in annual assessments shall be determined by multiplying the previous year's annual assessment by the percentage change in the Consumer Price Index.

B.      Properties owned by the Company, its successors or assigns, including third parties who acquire lands from the Company.

(1) The Company, its successors and assigns, shall contribute annually toward funding community services in Sea Pines Plantation one-half (1/2) of one per cent (0.5%) of the Adjusted Gross Resort Revenue which it earned during each immediately preceding fiscal year. For purposes of this Declaration, "Resort Revenue" shall mean all revenues and receipts of every kind, which are derived by the Company from the operation of the Hilton Head Inn and the Seascape Villas and the operation of resort facilities in Sea Pines Plantation, less:

(a) Any amounts collected by the Company on behalf of others, including but not limited to, property owners' part of rental income derived from property located within Sea Pines Plantation and the Seascape Villas, and gratuities and service charges which may be added to said facilities' bills or statements in lieu thereof;

(b) Credits or refunds made by the Company to patrons of said resort facilities;

(c) All amounts and credits received in connection with the operation of said resort facilities by the Company in settlement of claims for damages or claims arising from the ordinary course of trade; and

(d) All taxes directly related to said resort facilities imposed on the Company by any governmental entity.

The term, "resort facilities" as used herein shall include golf courses, tennis courts, rental boats and slips, restaurants and bars, hotels, motels, inns, rental homes and rental condominiums, retail shops and other similar facilities including commercial facilities of all kinds.

---

property in Sea Pines Plantation which is subject to the payment of the same or greater dollar amount of the assessments provided for herein." *See* 1974 Covenants, Article I(C) at Ex. A.

"Adjusted Gross Resort Revenues" for purposes of this Agreement shall be resort revenues, as defined above, multiplied by a fraction, the numerator of which shall be one (1), and the denominator of which shall be one (1), plus the percentage increase of the Consumer Price Index, All Items – All Groups (1967 = 100) over the preceding fiscal year (March 1 to February 28).

This provision for a percentage contribution of Adjusted Gross Resort Revenue shall be a covenant running with all lands in Sea Pines Plantation now owned by Sea Pines Plantation Company which are sold to a third person and used by said third person as Golf Courses, Tennis Courts, Renting Boats and Slips, Restaurants and Bars, Retail stores, Hotels, Motels, Inns or other commercial uses. Any person, partnership or corporation who acquires land in Sea Pines Plantation from the Company for one or more of said uses shall be subject to this Covenant and shall be required to contribute annually toward funding Community Services one-half (1/2) of one per cent (0.5%) of its Adjusted Gross Resort Revenue as provided above. Provided, however, that if the Company does not have management responsibilities or does not exercise some control over the management, other than the control imposed by the Company's standard commercial covenants, of any facilities described herein which are sold to third party entities, then said third party entities shall be required to contribute annually toward funding Community Services one per cent (1%) of its Adjusted Gross Resort Revenue as provided herein.

If the Participating Property Owner's annual assessment is adjusted in accordance with the provisions of Section A of this Article, the Company's and third party entities' contributions as provided herein shall likewise be adjusted by the same percentage adjustment which is applied to the Participating Property Owner's assessment.

Ex A, 1974 Covenants, Article III(A), (B).

17.

The 1974 Covenants further provide as follows:

(J) "Referendum" shall mean and refer to the power of the Participating Property Owners to vote by mailed ballots on certain actions including, without limitation, whether the Participating Property Owners shall accept any offer by the Company to convey to them as a group, or to a Trustee, appointed by a court of competent jurisdiction, any Properties. In the event seventy five (75%) percent of the votes actually returned to the Company or other properly appointed authority within the specified time shall be in favor of such actions, the action voted upon will be deemed to have been authorized by the Participating Property Owners; and will become effective as an amendment to these Covenants if approved by the Company. **A referendum may be called by the Company or shall be called**

**upon the written petition of at least ten percent (10%) of the Participating Property Owners.**  When a referendum is called, it shall be conducted by the Company with the assistance of the Participating Property Owners according to the following rules which may be modified or supplemented by the Company and the Sea Pines Plantation Property Owner Advisory Board:

> (1) Notice of the referendum together with ballots shall be mailed to the Participating Property Owners within sixty (60) days after the call.

> (2) The Participating Property Owners shall have not less than thirty (30) nor more than sixty (60) days from the date of mailing to return their ballots.

> (3) A Participating Property Owners shall have one vote regardless of the number of Residential Lots and Family Dwelling Units owned.  Joint owners of property shall only have one vote.

Ex. A, 1974 Covenants, Article I(J) (emphasis added).

18.

The 1974 Covenants have been subsequently amended four (4) times since their adoption; however, the above-cited provision concerning the conduct of referendums has not been amended at any time.

## CHAPTER 11 BANKRUPTCY AND FORMATION OF CSA

19.

On November 24, 1986, the Company filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of South Carolina, Case No. 86-03871 (the "Sea Pines Bankruptcy").

20.

On October 22, 1987, the Chapter 11 Trustee (John F. Curry) in the Sea Pines Bankruptcy entered into an Asset Purchase Agreement with Sea Pines Associates, Inc. ("SPA") to sell certain rights and assets previously held by the Company to SPA.

21.

Thereafter, SPA assigned all of its rights and interests obtained via the Asset Purchase Agreement with the Chapter 11 Trustee to a newly-formed incarnation of Sea Pines Plantation Company, Inc. ("SPPC II").[6]

22.

On November 17, 1987, the Chapter 11 Trustee executed an Assignment of Rights, in which the Chapter 11 Trustee conveyed certain rights and assets of the Company to SPPC II.  A true and correct copy of the Assignment of Rights executed by the Chapter 11 Trustee dated November 17, 1987 is attached hereto as Exhibit B and incorporated herein by reference.

23.

On December 8, 1988, the Chapter 11 Trustee and CSA executed a document entitled "Declaration of Covenants and Agreement of 1988 for the Transfer of Properties, Reserved Rights and Obligations of Hilton Head Liquidation Corp. to Community Services Associates, Inc." (the "1988 Covenants").  A true and correct copy of the 1988 Covenants is attached hereto as Exhibit C and incorporated herein by reference.

24.

In the 1988 Covenants, the Trustee conveyed to CSA certain community properties within Sea Pines Plantation (consisting of roadways, bike paths, streets, open spaces, lagoons, ditches, and other properties, real and personal) previously owned by the Company, and further conveyed the Company's obligation to manage, maintain, and preserve those community properties to CSA.

---

[6] The original Sea Pines Plantation Company, Inc. (i.e. the Company) changed its name to Hilton Head Liquidation Corp. on October 30, 1987 in order to allow SPA, or its designee, to form a new South Carolina corporation under the name of "Sea Pines Plantation Company, Inc.," for the purpose of holding title to certain of the assets being conveyed to SPA by the Chapter 11 Bankruptcy Trustee.

25.

According to the 1988 Covenants, CSA was formed for the specific purpose of undertaking the expressly limited rights and responsibilities that were conveyed to CSA by the 1988 Covenants. *See* Ex. C, Art. II.

26.

The Board of Directors of CSA is made up of nine (9) Residential Directors (Class "A" representatives), four (4) Commercial Directors (Class "B" representatives), and four (4) Resort Directors.

27.

Under the 1988 Covenants, CSA is responsible for furnishing community services and collecting and administering assessments and other revenues (including, but not limited to, gate entrance fees) to be used for the performance of community services. *See* Ex. C.

28.

Under the 1988 Covenants, every property owner in Sea Pines Plantation is a member of CSA. Ex. C at Article V, ¶ 5.1, at pp. 7-8.

29.

The 1988 Covenants do not in any way authorize CSA to call for or conduct a referendum to amend the 1974 Covenants. The 1988 Covenants state, in pertinent part:

5.8 <u>Member's Right to Approve Certain Actions by Mail Referendum</u>. The Board of Directors of CSA may, by resolution adopted by a majority of favorable vote of Class A directors and a majority of favorable votes of Class B directors, initiate a mail referendum in which members of CSA shall collectively have the power to approve or reject: (a) any merger of CSA with another property owner's association serving an adjoin tract; (b) amendments to any provision of this Declaration and Agreement except that no amendment may alter the directors elections or impair any right reserved to the property owners in Sea Pines Plantation or which may create or increase any liability of said property owners or CSA; (c) other fundamental and material actions designated in the CSA bylaws as actions for

which mail referendum must be held; and (d) the sale or redesignation of one (1%) percent or more of the Community Properties. In the event of a tie vote of Class B directors, such matter(s) as are the subject(s) of the tie vote shall be promptly submitted to arbitration in accordance with the rules and regulations of the American Arbitration Association. The decision rendered in such arbitration shall be final and binding upon the Board of Directors. Provided, however, that any merger between CSA and the Association of Sea Pines Plantation Property Owners, Inc. and the Advisory Board and the Irrevocable Trust shall require only a simple majority vote of CSA's Board of Directors.

Ex. C, 1988 Covenants, Article V, ¶ 5.8, pp. 14-15.

30.

The CSA ByLaws similarly restrict CSA's power to call for a referendum; they provide, in

pertinent part:

Section 4. Members' Right to Approve Certain Actions by Mail/Electronic Referendum Vote. The Board of Directors of CSA may, by resolution or affirmative vote of a majority of the Board as set forth below, initiate a referendum in which the Members shall have the authority to approve or reject by mail or electronic referendum the following:

(a) Any merger, consolidation or dissolution of CSA, subject to the condition that any such action must be carried out pursuant to a plan of merger, consolidation, or dissolution which provides for the uninterrupted exercise of CSA's principal duties with respect to the Community Properties.

(b) Any merger with another property owners' association serving an adjoining tract.

(c) Any amendment to any provision of the 1988 Covenants (except no amendment may alter the election of directors, or impair any right reserved to Members, or create or increase liability of Members or CSA).

(d) Any sale, gift, lease for more than one (1) year, of one percent (1%) or more of the Community Properties, except to the extent that "minor changes" in the boundaries of said Properties are allowed pursuant to Article II, Section 13 (5) of the 1974 Covenants, which right to make "minor changes" shall vest exclusively with the Board and be freely exercisable by the Board without approval or ratification by the Members.

(e) Any re-designation of one percent (1%) or more of any category (designated in the 1974 Covenants) of the Community Properties.

12

Section 5. Referendum Call, Approval, and Certification. All mail and/or electronic referendums shall be conducted in accordance with the process provided in the 1974 Covenants, the 1988 Covenants, and these Bylaws. In the event of any conflict, the 1974 covenants shall control.

(a) Call. A resolution calling for a Referendum must be adopted by a favorable vote of a majority of the Residential Directors then in office and a favorable vote of a majority of the Business Directors then in office. In the event of a tie vote of Business Directors, the matter shall be promptly submitted to arbitration in accordance with the rules and regulations of the American Arbitration Association. The decision rendered in such arbitration shall be final and binding upon the Board of Directors.

(b) Approval. A mail/electronic referendum is deemed "approved" if seventy-five percent (75%) or more of the ballots actually returned to CSA are in favor of the proposed action. In order to be counted, any ballot must be returned to CSA or its designated representative within thirty (30) days of the date that the ballot was marked as mailed by the United States Postal Service or via electronic means as specified by CSA.

(c) Certification. No mail/electronic referendum shall be effective unless a statement of the results thereof is:

(1) Signed by the President and Secretary of CSA in their representative capacities.

(2) Sent to the Members by United States mail or by electronic methods.

(3) Recorded in the Office of the Beaufort County Register of Deeds, in the name of CSA as an assignee of Resort's predecessor. Said statements shall include the effective date of the action, the date of the call for referendum, the total number of votes needed to adopt the action, and the total votes cast for and against the action.

*See* Restated Bylaws of Community Services Associates, Inc. adopted November 19, 2019, Article III, Sections 4, 5, pp. 4-5. A true and correct copy of the Restated Bylaws of Community Services Associates, Inc. is attached hereto as Exhibit D and incorporated herein by reference.

31.

According to its ByLaws, the purpose of CSA is to: (a) accept and hold title to the real property transferred to CSA in the 1988 Covenants; (b) assume and perform the duties, rights, and obligations assigned to CSA under the 1988 Covenants; and (c) perform the duties assigned to CSA under the 1988 Covenants, exercise the rights assigned to CSA under the 1988 Covenants, and manage the properties assigned to CSA under the 1988 Covenants properties "so as to maintain Sea Pines…as an attractive community and enhance the value of all properties in Sea Pines on a basis that does not discriminate among Owners, as herein defined."  Ex. D, Article I, Section 2, p. 1.

32.

CSA does not have the right to call for a referendum to amend the 1974 Covenants under either the 1988 Covenants or CSA ByLaws.

## PURCHASE OF SEA PINES RESORT

33.

In 2005, the Resort's parent company, Riverstone Group, LLC ("Riverstone"), purchased Sea Pines Resort.

34.

On March 20, 2007, a Deed Bill of Sale and Assignment of Rights was recorded at Deed Book 02539, Pages 1193-1204 of the Beaufort County, South Carolina real property records.  A true and correct copy of this Deed Bill of Sale and Assignment of Rights is attached hereto as Exhibit E and incorporated herein by reference.

35.

According to ASPPPO's Amended and Restated ByLaws, "[t]he basic purpose of ASPPPO shall be to provide a forum for and promote the common good and general welfare of Owners and to represent Owners in all matters in pursuit of these objectives." *See* ASPPPO Amended and Restated By-Laws, at p. 2. A true and correct copy of ASPPPO's Amended and Restated ByLaws is attached hereto as Exhibit F and incorporated herein by reference.

36.

ASPPPO's Amended and Restated By-Laws further state that, "[i]t shall be the duty of the Board to…[c]ause ASPPPO to act as a proper party to institute any legal proceeding at law or in equity to seek enforcement of all Covenants and Agreements as the representative of the Owners." Ex. F, p. 7.

37.

Membership in ASPPPO is limited to the owners of residential property in the Sea Pines Plantation community.

38.

There is significant overlap between the membership of the Boards of CSA and ASPPPO, despite the distinct functions and roles of each organization.

39.

William Johnson currently serves as both a Member on the Board of ASPPPO and as a Class "A" Residential Representative on the Board of Directors of CSA.

40.

Barry Barth currently serves as both the Vice President of ASPPPO and as a Class "A" Residential Representative on the Board of Directors of CSA.

41.

James Richardson currently serves as both a Member on the Board of ASPPPO and as a Class "A" Residential Representative on the Board of Directors of CSA.

42.

David Ellis currently serves as both the Secretary of ASPPPO and as a Class "A" Residential Representative on the Board of Directors of CSA.

43.

Richard Speer, Jr. currently serves as both the Treasurer of ASPPPO and as a Class "A" Residential Representative on the Board of Directors of CSA.

## THE DECEMBER 2020 REFERENDUM

44.

On November 17, 2020, the CSA Board of Directors held a meeting at which the Board of Directors discussed calling for a referendum which, if successful, would amend the 1974 Covenants, impose a new annual assessment upon the residential property owners of Sea Pines Plantation, and create an "Infrastructure Improvements Fund" to be managed by CSA and funded with the amounts raised through the new annual assessment. A true and correct copy of the proposed amendment to the 1974 Covenants is attached hereto as Exhibit G and incorporated herein by reference.

45.

At the conclusion of the discussion of this proposed referendum at the November 17, 2020 CSA Board of Directors meeting, the Chairman of the CSA Board of Directors, Larry Movshin, sought approval of the proposed referendum from Board Member Steve Birdwell, the Resort representative, and the requested approval was given.

16

46.

Thereafter, at this meeting, the CSA Board of Directors unanimously voted in favor of calling a referendum among the property owners of Sea Pines Plantation for the purpose of seeking to amend the 1974 Covenants to add a new Article V that would, among other things, impose a new, separate and distinct annual assessment of $600.00 per Family Dwelling Unit and $360 per residential lot on all of the Sea Pines Plantation residential property owners, for the purpose of creating and funding a new "Infrastructure Improvements Fund."    This new assessment would be in addition to the annual assessment paid into the "Community Fund" that is already imposed on the Participating Property Owners of Sea Pines.  *See* Ex. A, p. 19 and Ex. G.

47.

In correspondence dated November 17, 2020, from CSA Board Chairman Larry Movshin to Sea Pines Property Owners, Larry Movshin stated: "I am pleased to share with you that during today's Sea Pines CSA Board meeting, the Board finalized the terms and approved the 'call' for a simple Referendum to secure the funding to meet our infrastructure needs."  A true and correct copy of the November 17, 2020 correspondence is attached hereto as Exhibit H and incorporated herein by reference.  (*See also* Exhibit I, Letter dated December 1, 2020 from CSA to Sea Pines Property Owners, stating: "With this support, the Board has called for a referendum to be voted upon by all Participating Property Owners.")

48.

 Under the terms of the proposed amendment to the 1974 Covenants, the new "Infrastructure Improvements Fund" would be "used only for the repair, replacement, addition and improvement of the roads, bridges, bulkheads, leisure trails, storm water facilities and systems located in or servicing Sea Pines…."  Ex. G.

49.

Additionally, under the terms of the proposed amendment to the 1974 Covenants, the Resort would contribute 0.25% of its Adjusted Gross Annual Revenue (as that term is defined in the 1974 Covenants) to the new Infrastructure Improvements Fund, while the owners of leased business and commercial facilities in Sea Pines Plantation would contribute, on behalf of their tenants, $0.36 per square foot for first floor tenants and $0.27 per square foot for second floor tenants.

50.

CSA projects that the proposed additional assessment on residential property owners will raise an additional $35,000,000.00 over the next ten (10) years, which funds, CSA contends, are necessary to address a myriad of "critical infrastructure" needs that allegedly exist within Sea Pines Plantation.[7]

51.

Referendum ballots for the proposed amendment to the 1974 Covenants were mailed by CSA to Participating Property Owners on or about December 15, 2020. A true and correct copy of the mailed referendum notice and ballot are attached hereto as Exhibit J and incorporated herein by reference.

52.

Completed referendum ballots must be returned to CSA by its members no later than January 20, 2021. Ex. J.

---

[7] https://www.seapinesliving.com/sea-pines-referendum (last accessed January 11, 2021).

## CSA DERIVATIVE ACTION ALLEGATIONS

53.

Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and derivatively.  In the derivative capacity, Plaintiff brings this action, *inter alia*, on behalf of and for the benefit of CSA, to redress imminent and actual injuries suffered by CSA members as a direct and proximate result of Defendants' conduct.

54.

Plaintiff will adequately and fairly represent the interests of CSA and its similarly situated members in this litigation.

55.

Plaintiff is the record owner of real property located within Sea Pines Plantation and is a member in good standing of CSA.

56.

The wrongful acts complained of herein have caused harm, and will persist in subjecting CSA members to continuing harm because the adverse consequences of the injurious actions are still in effect.

57.

Plaintiff is a proper party to enforce the rights of CSA members where, as here, CSA's Board of Directors has failed to protect and/or enforce such rights.

58.

This action is not a collusive one to confer jurisdiction upon this Court that it would not otherwise have.

59.

Plaintiff previously made demand upon CSA to halt the proposed referendum complained

of herein but received no response.  In any event, such a demand would be futile, including for the

reasons identified below.

60.

In response to a derivative demand letter submitted by counsel on behalf of another CSA

member and residential property owner within Sea Pines Plantation contesting CSA's authority to

call for the referendum at issue, CSA's Chairman (Larry Movshin) rejected the demand and

publicly stated at the December 8, 2020 Special Meeting of the CSA Board of Directors:

> About a week ago, counsel for CSA received a letter from counsel for a property
> owner which suggested that that property owner's view that the call for a
> referendum that we made was outside the legal authority of CSA to do.  We have
> spent some time with our attorney today going over the process and we have
> confirmed that it is within our legal authority under the South Carolina Non-Profit
> Act to make the call as we did and consistent with our obligations and rights, and
> so we are moving forward with the referendum as it has been called.  We believe
> we have built up a substantial uh amount of goodwill and and (sic) uh momentum
> are we (sic) all of the indications on the various channels that we follow are that
> there is a strong support for the referendum.  We have received a number of
> comments and questions, all of which I am very satisfied we've been able to address
> and I believe the the (sic) FAQs that we use through our e-mail chain and letters
> have successfully addressed them.  So, we are going to move forward as we have.

*See*  https://www.youtube.com/watch?v=vpw4c8NXhXk&feature=youtu.be,  03:47-5:00  (last

accessed January 11, 2021).  This indicates, *inter alia*, that an additional demand by this Plaintiff

would likewise be disregarded and would therefore be futile.

61.

At a recent CSA Board of Directors Meeting held on October 26, 2020, CSA Chairman

Larry Movshin indicated, in response to a question from a CSA member regarding the Resort's

payment obligations for community services under Article III of the 1974 Covenants, that the CSA

Board was not willing to take legal action on this issue, as follows:

> Q [from Scott Williams]:  Why has the Resort been permitted to not pay its 1% annual fee share as defined in the covenants?
>
> A [Larry Movshin]:  Scott, as you've probably heard a dozen times, if not a hundred times, the covenant issue is not black and white. It's a legal matter. The resort feels very strongly that it is paying the correct amount at .5%. Others may have a different perspective, but at this point in time our counsel has been that we will accept continue (sic) to have the resort pay the 0.5 % and we're not prepared to take any legal action to the contrary. I don't know what more we can say.  They're paying what they appropriately believe and CSA continues to accept that as the proper the (sic) appropriate amount.

*See*  https://www.youtube.com/watch?v=UPFYw8H1ixU  at  1:15:28-1:16:20  (last accessed

January 11, 2021).

## **FIRST CAUSE OF ACTION- DECLARATORY JUDGMENT**
## **(AGAINST THE RESORT)**

62.

Plaintiff incorporates Paragraphs 1-61 of this Complaint by reference as if fully set forth

herein.

63.

This claim is brought pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201,

*et seq*., and/or the South Carolina Declaratory Judgment Act, S.C. Code § 15-53-10, *et seq*.

64.

The proposed Fifth Amendment to the 1974 Covenants that is the subject of the proposed

referendum states the amendment "is made as of the _____ day of _____, 2021, by Sea Pines

Resort, LLC a Virginia limited liability company [ ], with the acknowledgement of [CSA] and

[ASPPPO]."  The proposed Fifth Amendment also broadly states, without explanation, that "SPR

[the Resort] is the successor in interest to SPPC [the Company]…."  *See* Ex. G.

65.

Black's Law Dictionary defines "successor in interest" as follows:

successor in interest (1832).  Someone who follows another in ownership or control of property.  A successor in interest retains the same rights as the original owner, **with no change in substance**.

BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis supplied).

66.

The Resort does not currently possess **all** of the rights and privileges previously enjoyed by the Company under the 1974 Covenants.  Indeed, certain specific rights previously held by the Company under the 1974 Covenants were actually conveyed to CSA by the Company's Chapter 11 Bankruptcy Trustee via the 1988 Covenants.

67.

The Resort is not the successor in interest to the Company under the 1974 Covenants; rather, the Resort is, at best, a third-party transferee of only certain limited rights and privileges previously held by the Company under the 1974 Covenants.

68.

Plaintiff seeks a declaration from this Court that the Resort is not the successor in interest to the Company, for the purpose of exercising any claimed rights and privileges previously held by the Company under the 1974 Covenants.

69.

Plaintiff further seeks a declaration from this Court that the proposed amendment to the 1974 Covenants that is the subject of the aforementioned referendum is unlawful, unenforceable, and invalid, and must be withdrawn in light of the material and erroneous statement of authority claimed therein, namely, that the Resort is the successor in interest to the Company.

## SECOND CAUSE OF ACTION - DECLARATORY RELIEF
## (AGAINST CSA)

70.

Plaintiff incorporates Paragraphs 1-61 of this Complaint by reference as if fully set forth herein.

71.

This claim is brought pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and/or the South Carolina Declaratory Judgment Act, S.C. Code § 15-53-10, *et seq*.

72.

An actual controversy has arisen between Plaintiff and CSA relative to CSA's rights and duties under the 1974 Covenants, the 1988 Covenants, and governing CSA ByLaws concerning CSA's authority to promulgate a referendum seeking to amend the 1974 Covenants.

73.

CSA has called for a referendum and issued ballots to CSA members in which CSA requests that CSA members vote on the proposed amendment to the 1974 Covenants.

74.

CSA lacks authority to call for a referendum to amend the 1974 Amendments under both the 1988 Covenants and governing CSA ByLaws.

75.

CSA is the entity that has spearheaded and called for the referendum seeking to amend the 1974 Covenants; however, the Resort has given its approval of the referendum, as illustrated by the language of the amendment itself *(see* Ex. J) and the remarks of Resort Representative Steve Birdwell at the CSA Board of Directors Meeting held on October 26, 2020:

Larry, I wanted to mainly respond to a letter that you issued a few weeks ago that had some language and discussion regarding the Resort and as you and I have talked, we didn't agree with the letter. We thought it was very unfortunate that you issued the letter. It didn't clearly and correctly state our position. And I want everybody to know that we have always supported the community. We've always supported CSA. We strongly supported the previous referendum that was held last year. And our hesitation this time was not because we didn't want to support the community or we didn't want to support the community financially. We felt like we're in the middle of a crisis in the county, as you know, and it's impacted our community as well. Here we are in the middle of this coronavirus and the pandemic that has come along with it, and economic concerns and we just haven't felt like, our board and ownership has not felt like this was the right to time to increase *anyone's* assessment. Not the resort's assessment and certainly not the residential assessment. But if the community is supportive of the referendum, and this Board feels this is the right time to move forward, we will certainly support it as well, both with our approval and financially as well. So I just want to clarify, we didn't think the letter was clearly written and we want to make sure that people understood that we always have supported the community and supported CSA.

*See* https://www.youtube.com/watch?v=UPFYw8H1ixU at 12:07-13:48 (last accessed January 11, 2021).

76.

Under the 1974 Covenants, the authority to call for a referendum to amend the covenants is expressly limited to the owners of residential property within Sea Pines Plantation; the right to call for a referendum is also conditionally given to the Company and its lawful successors, if any. Ex. A, Art. I (J).

77.

CSA—and not the Company nor any successor entity to the Company—is the entity that has called for the subject referendum to amend the 1974 Covenants, which CSA lacks authority to do.

78.

CSA's actions in calling for and promulgating the proposed referendum seeking to amend the 1974 Covenants are *ultra vires* and beyond the scope of CSA's authority under the South

Carolina Nonprofit Corporation Act, S.C. Code § 31-31-101, *et seq*., and the recorded covenants and declarations of Sea Pines Plantation.

79.

Plaintiff seeks a declaration from this Court that the referendum called by CSA seeking to amend the 1974 Covenants is invalid and without any legal force or effect upon the property owners of Sea Pines Plantation, based upon CSA's lack of legal authority to call for such a referendum under the relevant governing documents.

## THIRD CAUSE OF ACTION - BREACH OF CONTRACT
## (AGAINST CSA)

80.

Plaintiff incorporates Paragraphs 1-61 of this Complaint by reference as if fully set forth herein.

81.

CSA is not authorized to call for a referendum seeking to amend the 1974 Covenants under the 1988 Covenants, CSA ByLaws, or any other recorded covenant or declaration of the Sea Pines Plantation community.

82.

The recorded covenants and declarations governing Sea Pines Plantation constitute binding agreements between the various parties thereto.

83.

CSA has breached the 1974 Covenants, the 1988 Covenants, as well as CSA's own ByLaws, by calling for a referendum seeking to amend the 1974 Covenants in the absence of legal authority to do so.

84.

CSA's actions in calling for a referendum seeking to amend the 1974 Covenants are *ultra vires*.

85.

Plaintiff and the other members of CSA have been damaged by CSA's breach of the 1974 Covenants, the 1988 Covenants, and CSA's ByLaws in an amount to be determined at the trial of this matter.

## FOURTH CAUSE OF ACTION - CIVIL CONSPIRACY
## (AGAINST THE RESORT, ASPPPO, AND CSA)

86.

Plaintiff incorporates Paragraphs 1-61 of this Complaint by reference as if fully set forth herein.

87.

Defendants CSA, ASPPPO, and the Resort have conspired to circumvent, subvert, and violate the referendum provisions of the 1974 Covenants, the 1988 Covenants, and CSA's ByLaws by allowing CSA to call for and promulgate a referendum that CSA lacks authority to call.

88.

On information and belief, the Resort does not desire to be the public face for a referendum that would increase community assessments within the Sea Pines Plantation community, in light of current conditions created by the COVID-19 pandemic, and the Resort has instead colluded with CSA and ASPPPO to allow CSA to initiate and call for the proposed referendum, in violation of the 1974 Covenants, the 1988 Covenants, and CSA ByLaws.

89.

As a result of the conspiracy between CSA, ASPPPO, and the Resort, Plaintiff (and the entire Sea Pines Plantation community) have been caused special damages, including but not limited to:

a.    The value of Plaintiff's property has been damaged and reduced by a combined effort of these entities that could not have been achieved had only one such entity acted alone;

b.    The recorded covenants and declarations that should protect Plaintiff's property value have been undermined;

c.    Plaintiff's confidence in ASPPPO and CSA to protect her property interests has been undermined;

d.    Plaintiff's trust that CSA will treat its residential property owner members equally and on par with the Resort and the commercial property members of CSA has been eroded; and

e.    Plaintiff's assurance that CSA, ASPPPO, and the Resort will comply with the recorded covenants and declarations of the Sea Pines Plantation community has been destroyed.

90.

Plaintiff is entitled to an award of actual, consequential, special, and punitive damages.

### FIFTH CAUSE OF ACTION - REAL PROPERTY, NUISANCE (AGAINST CSA, ASPPPO, AND THE RESORT)

91.

Plaintiff incorporates Paragraphs 1-61 of this Complaint by reference as if fully set forth herein.

92.

Plaintiff has a real property interest in the use and enjoyment of her real property within the Sea Pines Plantation community without the unauthorized interference of the Resort, ASPPPO, and CSA.

93.

Plaintiff's real property interest is embodied in the various recorded covenants and declarations that govern the Sea Pines Plantation community, including, but not limited to, the 1974 Covenants and the 1988 Covenants. The 1974 Declaration, including but not limited to its provisions on the payment of assessments and the procedure for amendment by referendum, is part of the "bundle of rights" that constitute Plaintiff's property interest.

94.

The Resort, ASPPPO, and CSA, by conspiring to promulgate the unauthorized referendum and proposed amendment to the 1974 Covenants, have substantially and unreasonably interfered with Plaintiff's use and enjoyment of her property. In particular, the Resort, ASPPPO, and CSA have interfered with Plaintiff's vested interest in the provisions of the 1974 Covenants regarding their modification, as well as in the provisions of the 1974 Covenants pertaining to assessments.

95.

Despite being placed on notice that CSA lacks authority to call for the proposed referendum to amend the 1974 Covenants, CSA, ASPPPO, and the Resort have failed and/or refused to withdraw the referendum.

96.

The Resort, ASPPPO, and CSA's conduct in interfering with Plaintiff's property interest is willful and with reckless disregard for Plaintiff's property rights.

97.

As a result, Plaintiff has been damaged and will continue to be damaged into the future as the interference continues.

98.

Plaintiff is entitled to nominal, actual, compensatory, and punitive damages, as well as immediate injunctive relief, due to the above-described actions by CSA, ASPPPO, and the Resort.

## SIXTH CAUSE OF ACTION - INJUNCTIVE RELIEF
## (AGAINST THE RESORT, ASPPPO, AND CSA)

99.

Plaintiff incorporates Paragraphs 1-61 of this Complaint by reference as if fully set forth herein.

100.

Plaintiff will be irreparably harmed if an injunction is not issued to enjoin the conduct of the aforementioned referendum and the implementation of the proposed amendment to the 1974 Covenants.

101.

Plaintiff is likely to succeed on the merits of her claims in this action.

102.

The equities in this action favor the granting of injunctive relief in Plaintiff's favor and the injunction is in the public interest.

103.

Plaintiff has no adequate remedy at law as to future damages if the proposed amendment to the 1974 Covenants is allowed to be implemented.

104.

Plaintiff seeks injunctive relief to enjoin any further action on the part of The Resort, ASPPPO, and CSA to conduct the proposed referendum seeking to amend the 1974 Covenants.

105.

Plaintiff further requests that the Court enjoin the implementation, approval, and/or recording of the proposed amendment to the 1974 Covenants by the Resort, ASPPPO, and CSA[8] in the event the proposed amendment is approved by the requisite number of Participating Property Owners within the Sea Pines Plantation Community.

WHEREFORE, Plaintiff prays that the Court will:

a) Enter an Order declaring that the Resort is not the successor in interest, to the Company under the 1974 Covenants  and that the proposed amendment is therefore invalid and has no force or legal effect;

b) Enter an Order declaring that CSA lacks authority to call for a referendum seeking to amend the 1974 Covenants and that the referendum called by CSA to amend the 1974 Covenants is invalid and without any legal force or effect upon the property owners of Sea Pines Plantation, based upon CSA's lack of legal authority to call for a referendum to amend the 1974 Covenants.

c) Enter an Order temporarily and permanently enjoining the Resort, ASPPPO, and CSA from taking any further action to conduct the proposed referendum seeking to amend the 1974 Covenants, and from taking any action to record, implement, and/or approve the proposed

---

[8] The proposed amendment to the 1974 Covenants contains signature lines for execution by The Resort, CSA, and ASPPPO. *See* Ex. J.

amendment to the 1974 Covenants in the event the proposed amendment is approved by the requisite number of Participating Property Owners of Sea Pines Plantation;

d) Enter an Order declaring that any purported amendment to the 1974 Covenants as a result of the December referendum is procedurally invalid and without any legal effect on the property interests of Plaintiff and other owners within Sea Pines Plantation who are members of CSA.

e) Award Plaintiff actual damages, consequential, damages, and, if appropriate, punitive damages;

f) Award Plaintiff pre-judgment and post-judgment interest;

g) Award Plaintiff her attorneys' fees and expenses of litigation; and

h) Grant Plaintiff such other and further relief as this Court deems just and proper.

**[signature block appears on the next page]**

Respectfully submitted,

FORD WALLACE THOMSON LLC

By: *s/ Ian Ford*
Ian S. Ford (Fed. Bar 9057)
   Ian.Ford@FordWallace.com
Ainsley F. Tillman (Fed. Bar 12847)
   Ainsley.Tillman@FordWallace.com
715 King St. | Charleston, SC 29403
(843) 277-2011
www.FordWallace.com

   -and-

**LOCKE LORD LLP**

Elizabeth J. Campbell
(to be admitted *pro hac vice*)
*Email: ecampbell@lockelord.com*
Steven J. Flynn
(to be admitted *pro hac vice*)
*Email: steven.flynn@lockelord.com*
Terminus 200, Suite 1200
3333 Piedmont Road NE
Atlanta, GA 30305
(404) 870-4600
(404) 806-5679 (fax)


*Attorneys for Plaintiff*



Dated: January 13, 2021.
Charleston, South Carolina