**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| JILL K. JINKS, *individually and as trustee of the Jinks Heritage Trust*, | ) ) ) | |
| Plaintiff, | ) ) | No. 9:21-cv-00138-DCN |
| vs. | ) ) | **ORDER** |
| SEA PINES RESORT, LLC; COMMUNITY SERVICES ASSOCIATES, INC.; and ASSOCIATION OF SEA PINES PLANTATION PROPERTY OWNERS INC. AND THE ADVISORY BOARD, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

The following matter is before the court on defendant Community Services Associates Inc. ("CSA"), defendant Sea Pines Resort LLC (the "Resort"), defendant Association of Sea Pines Plantation Property Owners Inc. and the Advisory Board ("ASPPPO," together with CSA and the Resort, "defendants"), and plaintiff Jill K. Jinks's ("Jinks") motions for summary judgment, ECF Nos. 105, 107, 109, and 110, respectively. For the reasons set forth below, the court grants defendants' motions and denies Jinks's motion.

## I.  BACKGROUND

This case concerns a referendum (the "Referendum") to amend a certain Declaration of Covenants and Restrictions dated September 7, 1974, recorded in the Beaufort County, South Carolina Register of Deeds (the "1974 Covenants"). The 1974 Covenants, along with various other recorded covenants and declarations, govern the rights and responsibilities of property owners in the Sea Pines Plantation community

1

located on Hilton Head Island, South Carolina.  The 1974 Covenants were executed by the then-owner and developer of the Sea Pines Plantation community, Sea Pines Plantation Company, Inc. (the "Company").  The Sea Pines Plantation community is comprised of residential properties, commercial properties, and the Sea Pines Resort, as well as golf courses, tennis courts, biking and leisure trails, and beach access.  The Resort currently owns and operates the Sea Pines Resort.

On November 17, 2020, CSA called the Referendum to amend the 1974 Covenants.  CSA is a South Carolina nonprofit corporation that is the record owner of the roads, gates, open spaces, and common properties in the Sea Pines Plantation community and performs repairs necessary to maintain the attractiveness and value of the community and its properties.  The proposed amendment, if enacted, would create an "Infrastructure Improvement Fund" and impose an additional annual assessment of $600.00 upon residential property owners in Sea Pines Plantation, including Jinks.  The Infrastructure Improvement Fund would be "used only for the repair, replacement, addition and improvement of the roads, bridges, bulkheads, leisure trails, storm water facilities and systems located in or servicing Sea Pines."  ECF No. 38, Amend. Compl. ¶ 54.

Under the 1974 Covenants, "Participating Property Owners" ("PPOs") are entitled to vote on the Referendum.  A PPO is defined under the 1974 Covenants as

> all those owners of Residential lots, and Family Dwelling Units, except the Company, who execute that certain Agreement, known as the 'Advisory Group Agreement', and all owners of Residential lots and Family Dwelling Units who purchase property in Sea Pines Plantation which is subject to the payment of the same or greater dollar amount of the assessments provided for herein.

ECF No. 38-1 at 3.  For the amendment to pass, seventy-five percent of the PPOs who return a ballot must vote in favor of the amendment, and "the Company," as defined in

the 1974 Covenants, must approve the amendment.  Before calling the Referendum, CSA sought approval from a Resort representative, and the requested approval was given. CSA and the Resort believe that the Resort was the proper party to provide the requisite approval of the proposed amendment by virtue of a series of assignments of the Company's rights in the 1974 Covenants.

The proposed amendment states that it is made by the Resort "with the acknowledgement of [CSA] and [ASPPPO]."  Amend. Compl. ¶ 75.  ASPPPO is a nonprofit corporation formed in 1973, whose stated mission is to provide a forum for and to promote the common good and general welfare of residential property owners on Sea Pines Plantation and to represent residential property owners in all matters in pursuit of these objectives.  On November 30, 2020, the ASPPPO board of directors held a special meeting adopting a resolution approving the proposed amendment to the 1974 Covenants. Following the passage of the resolution, ASPPPO encouraged its members to vote in favor of the Referendum.

Jinks, as a residential property owner in Sea Pines Plantation, objected to the Referendum based on her contention that none of the named defendants, including CSA, the Resort, or ASPPPO (collectively, "defendants"), had the authority to call for or approve any referendum to amend the 1974 Covenants.  Despite Jinks's objection, defendants moved forward with the Referendum.  At a CSA board of directors meeting, the chair of the board advised that the Referendum had passed.

On January 13, 2021, Jinks filed the instant action, asserting (1) declaratory judgment claims against the Resort and CSA; (2) breach of contract claims against CSA and ASPPPO; and (3) permanent injunction claims against all defendants for their actions

taken in connection with the Referendum.[1]  In particular, Jinks seeks a declaration that defendants lacked the legal authority to call for the Referendum or to implement the Referendum and that the proposed amendment is invalid.  On January 27, 2021, the parties entered a stipulation whereby they agreed that CSA would not file the amendment at issue without at least thirty days prior notice to Jinks and this court.  ECF No. 18.  To date, the amendment has not been filed and no assessments contemplated therein have been collected.

On June 3, 2022, CSA, the Resort, ASPPPO, and Jinks all filed motions for summary judgment.  ECF Nos. 105, 107, 109, and 110, respectively.  On July 7, 2022, Jinks responded to CSA, the Resort, and ASPPPO's motions.  ECF Nos. 121, 118, and 119, respectively.  On July 14, 2022, CSA, the Resort, and ASPPPO replied.  ECF Nos. 124, 123, and 126, respectively.  On June 30, 2022, CSA responded to Jinks's motion, ECF No. 115, and on July 7, 2022, Jinks replied, ECF No. 120.  On July 7, 2022, the Resort responded to Jinks's motion, ECF No. 116, and on July 14, 2022, Jinks replied, ECF No. 122.  On July 7, 2022, ASPPPO responded to Jinks's motion, ECF No. 119, and on July 14, 2022, Jinks replied, ECF No. 126.  The court held a hearing on the motions on August 8, 2022.  ECF No. 128.  As such, all motions for summary judgment have been fully briefed and are now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any

---

[1] Jinks initially asserted civil conspiracy and nuisance causes of action against defendants, but the court subsequently dismissed those claims.  See ECF No. 76.

material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### III.   DISCUSSION

All parties seek summary judgment in their favor on Jinks's claims. For ease of discussion, the court discusses the parties' arguments with respect to Jinks's claims against each defendant in turn below to determine whether summary judgment is warranted.

#### A.  Claims against CSA

The question of whether CSA had authority to call the Referendum is at the heart of Jinks's claims against CSA for declaratory judgment, breach of contract, and injunctive relief. CSA argues that certain governing documents and the South Carolina Non-Profit Act authorize it to call the Referendum. Alternatively, CSA argues that if its

call of the Referendum was unauthorized, the PPOs ratified the call when a majority

voted in favor of the amendment contemplated in the Referendum.  The court discusses

each argument in turn, ultimately finding that while CSA did not have authority to call

the Referendum, the PPOs ratified that unauthorized act.

### 1.  Authority Under the Governing Documents

CSA argues that its authority to call the Referendum derives from certain

governing documents, specifically the 1974 Covenants, the 1988 Covenants, and the

2007 Amendment.  The court discusses each in turn, ultimately concluding that none of

them provide CSA authority to call the Referendum.

### a.  1974 Covenants

The key provision of the 1974 Covenants in this case is Article I, § (J), which

provides in pertinent part that "A referendum may be called by the Company or shall be

called upon the written petition of at least ten percent (10%) of the Participating Property

Owners."  ECF No. 38-1 at 6 (emphasis added).  In other words, the 1974 Covenants

expressly provide that the "Company" or the PPOs upon petition can call a referendum.

CSA argues that its call of the Referendum is permissible under the 1974

Covenants because that document does not state that a call by the Company or a written

petition of ten percent of the PPOs are the exclusive methods of calling a referendum.

CSA avers that the 1974 Covenants did not intend for these to be the exclusive methods

of calling a referendum because other provisions expressly state that they are subject to

such limitations by, for example, using the terms "only" or "exclusive."  See, e.g., ECF

No. 38-1 at 6 ("Joint owners of property shall only have one vote."); id. at 15 (providing

that Sea Pines Club shall continue to be a private golf course for the "exclusive use" of

owners of property in Sea Pines who are members of Sea Pines Club and guests); id. at 19 ("[T]wo (2) or more contiguous Residential Lots shall be assessed only the Assessment for a Family Dwelling Unit."); id. at 24 ("Upon sale of property by the Company to a third party, such purchaser shall only be obligated to pay an assessment amount related to that portion of the assessment year remaining.") (emphases added in all). The court is unpersuaded and finds that the two options for calling a referendum provided in the 1974 Covenants were intended to be exclusive. "One cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties." S.C. Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC, 667 S.E.2d 7, 12 (S.C. Ct. App. 2008). To hold that the two articulated methods of calling a referendum are not exclusive would mean that the 1974 Covenants provided no limitation on who may call a referendum. Surely, the parties did not intend for any unaffiliated third-party to be able to call a referendum, and the provision at issue shows an express intent, at the very least, that a referendum may not be called by a petition of less than ten percent of PPOs. Moreover, South Carolina courts subscribe to the maxim "expressio unius est exclusio alterius," which provides that the express inclusion of one thing implies the exclusion of another. S.C. Dep't of Consumer Affs. v. Rent-A-Ctr., Inc., 547 S.E.2d 881, 884 (S.C. Ct. App. 2001) (applying this maxim to determine legislative intent). By providing that the Company and the PPOs upon petition may call a Referendum, the 1974 Covenants implied the exclusion of calling a Referendum by any other entity, person, or means. Therefore, the 1974 Covenants do not authorize CSA's call of the Referendum.

### b.  1988 Covenants

Additional covenants were filed in 1988 following major bankruptcies affecting Sea Pines Plantation.  Specifically, the December 8, 1988 "Declaration of Covenants and Agreement of 1988 for the Transfer of Properties, Reserved Rights and Obligations of Hilton Head Liquidation Corp. to Community Service Associates, Inc." (the "1988 Covenants") were filed by the liquidating trustee for Hilton Head Liquidation Company (formerly known as Sea Pines Plantation Company, Inc.)[2] and CSA.  See ECF No. 38-3. The 1988 Covenants contemplated the conveyance of certain rights of the Company to CSA.  Article V, § 5.8 of the 1988 Covenants specifically discusses CSA's right to initiate a mail referendum for its members in certain scenarios:[3]

> **5.8 Member's Right to Approve Certain Actions by Mail Referendum.** The Board of Directors of CSA may, by resolution adopted by a majority of favorable vote of Class A directors and a majority of favorable votes of Class B directors, initiate a mail referendum in which members of CSA shall collectively have the power to approve or reject:
>> (a) any merger of CSA with another property owner's association serving an adjoin tract;
>> (b) amendments to any provision of this Declaration and Agreement except that no amendment may alter the directors elections or impair any right reserved to the property owners in Sea Pines Plantation or which may create or increase any liability of said property owners or CSA;
>> (c) other fundamental and material actions designated in the CSA bylaws as actions for which mail referendum must be held; and
>> (d) the sale or redesignation of one (1%) percent or more of the Community Properties.
>
> In the event of a tie vote of Class B directors, such matter(s) as are the subject(s) of the tie vote shall be promptly submitted to arbitration in accordance with the rules and regulations of the American Arbitration Association. The decision rendered in such arbitration shall be final and binding upon the Board of Directors. Provided, however, that any merger between CSA and the Association of Sea Pines Plantation Property Owners,

---

[2] The original developer, the Company, changed its name to Hilton Head Liquidation Corp. on October 30, 1987.

[3] Pursuant to the 1988 Covenants, every PPO is a member of CSA.

>Inc. and the Advisory Board and the Irrevocable Trust shall require only a
>simple majority vote of CSA's Board of Directors.

ECF No. 38-3 at 14–15 (emphasis added).

CSA argues that §§ 5.8(b) and (c) of the 1988 Covenants expressly recognize the right of CSA to call the Referendum at issue. Jinks disagrees on both fronts. According to Jinks, CSA cannot rely on § 5.8(b) for two reasons. First, § 5.8(b) by its express terms only authorizes CSA to initiate a mail referendum that seeks to amend "this Declaration and Agreement"—referring to the 1988 Covenants and not the 1974 Covenants. Id. CSA argues that this limitation "does not make sense" because "the 1988 Covenants are clearly intended to be complementary to the 1974 Covenants." ECF No. 124 at 4. However, the court must interpret this provision by its unambiguous and plain language, which only permits a referendum that seeks to amend the 1988 Covenants and not the 1974 Covenants. As such, the court agrees with Jinks that CSA cannot rely on this provision as authority to call the Referendum in this case.

Second, even if the provision did permit CSA to call a referendum to amend the 1974 Covenants, § 5.8(b) explicitly prohibits CSA from calling a referendum that would "increase any liability of the property owners." Id. According to Jinks, the Referendum at issue seeking to impose an additional annual assessment of $600.00 on its membership would increase the liability of property owners. ECF No. 105-1 at 28–29. CSA agrees that the amendment increases the liability of the PPOs but maintains that § 5.8(b) only prohibits CSA from calling a referendum that would increase the liabilities of the PPOs to third parties, rather than to CSA. Again, this is not what the unambiguous and plain language of § 5.8(b) says, as there are no qualifiers attached to the liability exception in the subsection. Therefore, the court finds that the exception articulated in § 5.8(b)

precludes Jinks from relying on Article V, § 5.8 of the 1988 Covenants as authority for calling the Referendum.

Jinks additionally challenges CSA's reliance on § 5.8(c) of the 1988 Covenants as authorization to call the Referendum.  Jinks argues that this provision must be read concurrently with CSA's bylaws.  In other words, § 5.8(c) authorizes the CSA Board to "initiate a mail referendum in which members of CSA shall collectively have the power to approve or reject…other fundamental and material actions <u>designated in the CSA bylaws as actions for which mail referendum must be held</u>."  ECF. 38-3 at 14 (emphasis added).  CSA's bylaws only permit CSA to call a referendum on the following matters:

> a) Any merger, consolidation or dissolution of CSA, subject to the condition that any such action must be carried out pursuant to a plan of merger, consolidation, or dissolution which provides for the uninterrupted exercise of CSA's principal duties with respect to the Community Properties.
> b) Any merger with another property owners' association serving an adjoining tract.
> c) Any amendment to any provision of the 1988 Covenants (except no amendment may alter the election of directors, or impair any right reserved to Members, or create or increase liability of Members or CSA).
> d) Any sale, gift, lease for more than one (1) year, of one percent (1%) or more of the Community Properties, "except to the extent that "minor changes" in the boundaries of said Properties are allowed pursuant to Article II, Section 13 (5) of the 1974 Covenants, which right to make "minor changes" shall vest exclusively with the Board and be freely exercisable by the Board without approval or ratification by the Members.
> e) Any re-designation of one percent (1%) or more of any category (designated in the 1974 Covenants) of the Community Properties.

ECF No. 38-4 at 4.  Nothing in CSA's bylaws authorizes CSA to call a funding referendum or a referendum to amend the 1974 Covenants.  During the hearing, counsel for CSA conceded this point.  As such, CSA has not created a genuine factual dispute that it has authority to call the Referendum to amend the 1974 Covenants as a "fundamental

10

and material action[] designated in the CSA bylaws as [an action] for which mail referendum must be held." See ECF. 38-3 at 14.  Accordingly, the court finds that the 1988 Covenants do not provide CSA authority to call the Referendum.

### c. 2007 Amendment

Finally, CSA argues that it has authority to call the Referendum pursuant to an amendment to the 1974 Covenants, dated June 29, 2007 and filed July 8, 2007 (the "2007 Amendment").  The 2007 Amendment named CSA as the designee to collect annual assessments and created CSA's authority to institute a special assessment in the event of a natural disaster.  The 2007 Amendment deleted the first paragraph of the prior Article III of the 1974 Covenants and replaced it with the following language:

> Community Fund. Community Services Associates, Inc., a South Carolina corporation ("CSA") shall have the power to levy assessments, fees and charges as provided for herein. Assessments, fees and charges will be used to provide a Community Fund to operate, maintain and improve Sea Pines Plantation. In addition, the Community Fund will be used to maintain and preserve an attractive community and to maintain the general safety and security of Sea Pines Plantation. Each owner of property in Sea Pines Planation shall pay the assessment levied by CSA as provided for herein on such owner's property.

ECF No. 105-7 at 2–3 (emphasis added).  CSA relies on the underlined language to argue that "the 2007 Amendment clearly put CSA in charge of fundraising for the common areas by amending Article I of the 1974 Covenants."  ECF No. 105-1 at 28.  CSA argues that if it has power to levy assessments for common areas, then it must also have the power to call a referendum to amend the covenants to impose such an assessment.  Jinks, on the other hand, argues that the limiting language "as provided for herein" means that CSA lacks the ability to levy assessments on the PPOs that are not otherwise authorized under the 2007 Amendment or the related 1974 Covenants.  According to Jinks, the 2007

11

Amendment does little more than authorize CSA to collect the assessments from the PPOs that are already expressly authorized under other provisions of the 1974 Covenants. It does not provide CSA with any independent authority whatsoever to call a referendum to amend the 1974 Covenants.

Notably, nothing in the 2007 Amendment modifies or amends Article I, § J of the 1974 Covenants, which provides that a referendum to amend the 1974 Covenants may be called by "the Company" or shall be called upon a written petition signed by at least ten percent of the PPOs. This is important because CSA called the Referendum at issue <u>to amend the covenants</u>, not simply to impose an assessment. Nowhere in the 2007 Amendment or 1974 Covenants is CSA given authority to amend the covenants, and the court will not infer any authority to do so simply by virtue of CSA's involvement in levying and collecting authorized assessments. If the parties had intended for CSA to call a referendum to amend the 1974 Covenants, they could have amended Article I, § J to explicitly grant it that authority.

Moreover, the 2007 Amendments do not provide CSA with unfettered authority to levy assessments for common areas or otherwise. Again, the 2007 Amendment limits CSA's ability to "levy assessments" on the PPOs only "as provided for herein." The paragraph in which this provision is found is the introductory paragraph to Article III of the 1974 Covenants. Following that introductory paragraph, the 2007 Amendment replaced Paragraph A of Article III with a new Paragraph A that discusses an annual assessment, which CSA may determine for any year so long as it does not exceed the increase in the Consumer Price Index ("CPI") for the most recent twelve-month period prior to that determination. The 2007 Amendment also added Paragraphs D through F of

Article III which discuss CSA's ability to levy a special assessment for emergency funding following an extraordinary disaster, discuss the interest charges and costs of collecting delinquent assessments, and provide that assessments, interest, and collection charges constitute a continuing lien on the property and personal obligation on the owner of the property when the assessment became first due and payable. Thus, the limitation "as provided for herein" must be read in the context of Article III and the particular assessments that CSA may levy discussed therein, including the annual assessment and the extraordinary disaster assessment that would comprise the "Community Fund." If the 2007 Amendment provided CSA with unlimited authority to impose assessments, then the CPI limitation on the annual assessment that CSA may impose and the extraordinary disaster limitation on the special assessments that CSA may impose would be rendered meaningless. Such an expansive interpretation of the 2007 Amendment would not comport with the intent of the parties. The Referendum called by CSA contemplated amending the covenants to add an additional "Infrastructure Improvement Fund" that went beyond the annual assessment increase limited by the CPI and the extraordinary disaster assessment. CSA does not have the power to levy such an assessment under the 1974 Covenants or the 2007 Amendment, and the court thus rejects CSA's argument that it should be able to call the Referendum because it supposedly has the power to levy the assessment contemplated in that Referendum on its own.

### 2. The South Carolina Non-Profit Act

CSA next argues that even the governing documents do not explicitly provide it authority to call the Referendum, the South Carolina Non-Profit Act, S.C. Code § 33-31-

101 et. seq. (the "SCNPA") affords it such authority. The SCNPA provides in pertinent part:

> Unless its articles of incorporation provide otherwise, every corporation has perpetual duration and succession in its corporate name and has the same powers as an individual to do all things necessary or convenient to carry out its affairs including, without limitation, power:
>> [ . . . ]
>> (15) to impose dues, assessments, and admission and transfer fees upon its members;
>> [ . . . ]
>> (17) to carry on a business;
>> (18) to do all things necessary or convenient, not inconsistent with law, to further the activities and affairs of the corporation.

S.C. Code § 33-31-302 (15), (17) and (18).

As set forth in the comments to this section, "As a result of section 3.02, it is not necessary for a corporation to provide in its articles or bylaws that it has any particular powers. If nothing is said, a corporation automatically has the powers set forth in section 3.02." S.C. Code § 33-31-302 notes to 1994 amendment. The comments further provide that "It is the intent of this new statute, as specifically required in Section 33-31-302(18), that every nonprofit corporation has the unbridled power to 'do all things necessary or convenient, not inconsistent with law, to further the activities and affairs of the corporation.' Section 33- 31-302 of this Act is not to be narrowly construed." Id.

CSA relies on the SCNPA to argue that it automatically has the power to impose assessments and fees on its members. Jinks, on the other hand, argues that CSA only has such powers under SCNPA if its governing documents do not "provide otherwise." Jinks maintains that because the 1974 and 1988 Covenants limit CSA's ability to call the Referendum or impose assessments on its members, the SCNPA does not come into play. The court agrees. As discussed previously, the 1974 Covenants specifically contemplate

a call for a referendum only by the Company and the petition of at least ten percent of the PPOs. The 1988 Covenants and the 2007 Amendment do not change the rules governing a call for a referendum. Although CSA argues that the governing documents do not specifically prohibit CSA from calling a referendum, the court has found the two methods provided in the 1974 Covenants to be exclusive. Thus, to the extent the SCNPA permits CSA to impose assessments and "to do all things necessary or convenient . . . to further the activities and affairs of the corporation," the 1974 Covenants' provision on the matter of calling Referendums to amend the Covenants sufficiently "provide[s] otherwise." Likewise, the explicit discussion in the 2007 Amendments of the assessments that CSA may call (annual assessments limited by the CPI and extraordinary disaster assessments) sufficiently "provide otherwise" to limit the assessments that CSA may impose on PPOs to only those discussed therein.

### 3. Ratification

CSA next argues that even if the Sea Pines community's governing documents or the SCNPA do not authorize it to call the Referendum, the PPOs ratified any defect in the call by overwhelmingly adopting the amendment imposing the "Infrastructure Improvement Fund." Under South Carolina law, "[r]atification . . . means the express or implied adoption and confirmation by one person of any act or contract performed or entered into in his behalf by another who at the time assumed to act as his agent."[4] Lincoln v. Aetna Cas. & Sur. Co., 386 S.E.2d 801, 803 (S.C. 1989).

---

[4] The parties do not dispute that CSA may be considered the PPO's agent for ratification purposes, and the court is satisfied that it may. CSA acted as the PPO's agent in calling the Referendum that the PPO's were entitled under the 1974 Covenants to call by petition themselves.

"Ratification proceeds upon the assumption that there has been no prior authority."

Certus Bank, N.A. v. Bennett, 2016 WL 757501, at *3 (S.C. Ct. App. Feb. 24, 2016)

(citing 2A C.J.S. Agency § 52 (2013)).  "However, once a ratification has occurred, it is

equivalent to original, prior, or previous authority."  Id.

Three essential elements are necessary to prove ratification: (1) acceptance by the

principal of the benefits of the agent's acts; (2) full knowledge of the material facts; and

(3) circumstances or an affirmative election indicating an intention to adopt the

unauthorized arrangements.  Anthony v. Padmar, Inc., 465 S.E.2d 745, 755 (S.C. Ct.

App. 1995).  "A fact is material to the choice of a principal to ratify an agent's

unauthorized act if it concerns the existence and the extent of the obligations created by

the transaction."  2A C.J.S. Agency § 61.

Jinks exclusively challenges the second element of ratification and argues that the

PPOs did not have full knowledge of the material facts to be capable of ratifying the call

for the Referendum.  Specifically, Jinks maintains that the PPOs did not have knowledge

that (1) the Resort declined to call the Referendum; (2) the Resort would call the

Referendum only if it was indemnified by CSA; (3) the Resort preferred that the

Referendum be called using the ten percent petition method; (4) the 1974 Covenants, the

1988 Covenants, and its own bylaws did not authorize CSA to call the Referendum; and

(5) not all PPOs that were eligible to vote were permitted to vote.  CSA argues that none

of this information is sufficiently material to preclude ratification.

A reasonable jury could not find that any of the first three facts constitute material

information necessary for the PPOs to ratify the Referendum.  Simply put, the Resort's

preference for the method of calling the Referendum or its decision not to call the

Referendum itself is in no way relevant to any PPO's decision to participate in the Referendum or vote in favor of or against the amendment. Therefore, the PPOs' knowledge of those facts would not affect their ability to ratify CSA's Referendum call.

The fourth fact that CSA allegedly failed to disclose—that it lacked authority to call the Referendum—likewise does not preclude ratification. CSA concedes that it cannot state that each and every voting PPO had full knowledge of the claim that CSA did not have authority to call the Referendum. However, it maintains that it need not prove that fact. According to CSA, it need only show that the PPOs had constructive knowledge, or that there were "circumstances putting a reasonably prudent man on inquiry" of its lack of authority for its ratification defense to succeed. See Lincoln, 386 S.E.2d at 803. In other words, if CSA did not have the authority to call the Referendum, all members should have known that by virtue of publicly filed documents. The court disagrees with CSA's proposition that ratification only requires constructive notice rather than actual knowledge. See Restatement (Third) of Agency, § 4.06 cmt. b (2006) ("Ratification requires that the principal have actual knowledge of material facts, not notice . . ."). To be sure, the South Carolina Court of Appeals in Lincoln suggested that only inquiry notice is required. Lincoln, 386 S.E. 2d at 803. However, the Court of Appeals more recently indicated by way of citation to the Restatement of Agency that "actual of knowledge of the relevant material facts" is required. Stiltner v. USAA Cas. Ins. Co., 717 S.E.2d 74, 79 (S.C. Ct. App. 2011) (citing Restatement (Third) of Agency, § 4.06 cmt. b (2006)). Still, "[w]hile it has been said that the knowledge required as a basis for ratification must be actual rather than constructive, the circumstances may indicate actual knowledge." Stone v. First Wyo. Bank N. A., Lusk, 625 F.2d 332, 344 (10th Cir.

17

1980). To the extent CSA is arguing that the circumstances of the public filing of the Sea Pines community's governing documents indicate actual knowledge, this court previously rejected that argument in the context of its order on a motion to compel, explaining,

> [t]he court is not satisfied that a reasonably prudent man would have been on notice of CSA's lack of authority to call the referendum simply because the documents necessary to determine CSA's authority are a matter of public record. A variety of documents govern the rights and responsibilities of the many entities involved in the Sea Pines Plantation community. Untangling the interplay between these documents is no easy feat, even when the documents are summarized in relevant part in the complaint. The 1974 Covenants, and the rights and interests therein, have been subject to several assignments to various entities over the years. A determination of CSA's authority to call a referendum requires not only a careful review of the 1974 Covenants and its respective assignments, but also a close examination of CSA's bylaws and the 1988 covenants that conveyed to CSA an obligation to manage, maintain, and preserve certain Sea Pines Plantation properties. See ECF No. 1-3. Suffice it to say, a layperson could not readily discover whether CSA lacked the authority to call a referendum simply by referencing the public record, as CSA suggests. The fact that CSA has not conceded that it lacked authority to call the referendum, but rather only "assume[s] for purposes of this motion" that it lacked authority, belies CSA's argument that the Participating Property Owners should have known, as a matter of law, that it lacked such authority.

ECF No. 59 at 10. CSA challenges the court's previous reasoning, arguing that "Property owners are charged with constructive notice of instruments recorded in their chain of title." ECF No. 105-1 at 34 (citing Harbison Cmty. Ass'n, Inc. v. Mueller, 459 S.E. 2d 860, 863 (S.C. Ct. App. 1995); S.C. Code Ann. § 30-9-30 (2007) ("The filing is notice to all persons, sufficient to put them upon inquiry of the purport of the filed instrument and the property affected by the instrument.")). Again, because ratification requires actual and not constructive knowledge, this argument is of no moment. Moreover, the court stands by the reasoning in its prior order and does not find that the PPOs can be charged

18

with actual knowledge that CSA lacked authority to call the Referendum based on public

filings—again, particularly since CSA continues to dispute that point.[5]

Regardless, the court finds that CSA's authority—or lack thereof—to call the

Referendum is not material information for ratification purposes as a matter of law. It

bears repeating that "[r]atification proceeds upon the assumption that there has been no

prior authority." Certus Bank, 2016 WL 757501, at *3 (citing 2A C.J.S. Agency § 52

(2013)). In other words, the purpose of ratification is to adopt an agent's act

notwithstanding the fact that it was unauthorized. Thus, knowledge of the agent's

authority to do the act should not impact a principal's ability to ratify. Moreover,

information is material only "if it concerns the existence and the extent of the obligations

created" by the unauthorized act. 2A C.J.S. Agency § 61. The obligations created by the

call were fully set forth in the proposed amendment and notified the PPOs of the $600

assessment to be imposed by CSA for infrastructure improvement. A reasonable jury

could not find that knowledge that CSA's call was unauthorized had any bearing on a

---

[5] For similar reasons, the court rejects CSA's argument that the PPOs had constructive knowledge of the challenge to its authority to call the Referendum by virtue of the widely advertised and publicly streamed "Special Board Meeting" held on December 8, 2020. See ECF No. 105-1 at 15. Notably, a jury could find that the PPOs had actual knowledge of the challenge to its authority to call the Referendum by virtue of the December 9, 2020 email blast to 9,133 email addresses on file for CSA members that noted that CSA held the Special Board Meeting to "address allegations from counsel for a residential property owner concerning the validity of the Referendum procedures being pursued by the Board." ECF No. 105-14 at 20. However, this factual issue does not make ratification an issue for trial because, as the court explains below, CSA's authority to call the Referendum was not material information necessary for ratification as a matter of law.

PPO's decision to adopt CSA's call of the Referendum as their own[6] and retain the benefits and obligations of that call and the proposed amendment.

Finally, with respect to the fifth "fact," Jinks argues that CSA did not allow 193 of 194 Marriott timeshare owners to vote. ECF No. 110-1 at 31–32. Instead, CSA only permitted one vote in the Referendum for the Marriott timeshare property building, regardless of the number of units located therein. Jinks complains that CSA nevertheless intends to collect the $600.00 annual assessment from each of the 194 units. In the court's view, this argument goes to the third element of ratification—circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangements. In other words, here, Jinks appears to be challenging whether the voting process was properly conducted such that at least seventy-five percent of the PPOs did, in fact, vote in favor of the amendment. Regardless, as discussed below, Jinks fails to create a genuine issue of material fact that any defect in the voting process would have affected the ultimate outcome of the Referendum.

CSA argues that its voting approach with respect to Marriott timeshare owners was proper because Article I, § (J)(3) of the 1974 Covenants clearly states with reference to a Referendum: "A Participating Property Owner shall have one vote regardless of the number of Residential Lots and Family Dwelling Units owned. Joint owners of property shall only have one vote." ECF No. 38-1 at 6 (emphasis added). Again, a PPO is defined under the 1974 Covenants as

> all those owners of Residential lots, and Family Dwelling Units, except the Company, who execute that certain Agreement, known as the 'Advisory Group Agreement', and all owners of Residential lots and Family Dwelling

---

[6] Again, the PPOs could have called the Referendum themselves upon a ten-percent petition.

> Units who purchase property in Sea Pines Plantation which is subject to the payment of the same or greater dollar amount of the assessments provided for herein.

ECF No. 38-1 at 3. Jinks does not articulate how CSA's voting approach is impermissible under the covenants, but instead argues that the approach "hardly seems fair." ECF No. 120 at 5. Of course, Jinks cannot win the day on a fairness argument if the voting approach is permissible under the covenants. Moreover, even if the 193 Marriott timeshare owners were improperly denied a vote, Jinks fails to explain or provide any evidence that permitting these votes would have changed the outcome of the Referendum. Jinks cites CSA's calculation that 517 PPOs would have needed to change their favorable vote to a vote in opposition for the Referendum to fail. Jinks does not provide her own calculation as to how the 193 votes could have impacted the Referendum outcome, but instead broadly states that the Marriott "is not the only timeshare building located within Sea Pines. All of these potential votes add up." Id. at 6. At this late stage of the litigation, Jinks cannot survive summary judgment by merely speculating that a sufficient number of timeshare votes were improperly denied such that it affected the outcome of the Referendum.

Because Jinks has not cited any material information that CSA failed to provide the PPOs regarding the call for the Referendum and has not challenged the other elements of ratification, there is no genuine dispute of material fact that CSA's call of the Referendum was ratified. Ratification is "equivalent to original, prior, or previous authority," and therefore summary judgment is warranted in CSA's favor on all Jinks's claims. See Certus Bank, 2016 WL 757501, at *3.

### B.  ASPPPO

Jinks brings breach of contract and injunctive relief claims against ASPPPO.  To prove a breach of contract claim, Jinks must prove: (1) the existence of a contract, (2) the breach of that contract, and (3) damages caused by that breach.  See Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC, 780 S.E.2d 263, 272 (S.C. Ct. App. 2015).  In their arguments regarding summary judgment, Jinks and ASPPPO dispute four issues with respect to the breach of contract claim.   First, they dispute whether Jinks can show that ASPPPO breached any provision of the 1974 Covenants, the 1988 Covenants, or ASPPPO's bylaws in connection with the Referendum.  Second, the parties dispute whether the actions undertaken by ASPPPO's board with respect to the Referendum were protected by the business judgment rule.  Third, the parties dispute whether Jinks can prove damages from ASPPPO's actions.  Fourth, the parties dispute whether any breach of contract by ASPPPO should be excused on ratification grounds when the majority of the PPOs voted in favor of the Referendum and proposed amendment.  The court discusses each issue in turn, ultimately finding that Jinks's breach of contract and injunctive relief claims against ASPPPO fail.

### 1.  Breach of 1974 Covenants, 1988 Covenants, or Bylaws

The parties first dispute whether ASPPPO breached any provision in the 1975 Covenants, 1988 Covenants, or its own bylaws.  ASPPPO does not dispute that all three are valid contracts.  Rather, ASPPPO argues that Jinks has failed to show that it breached any of those contracts.  The court agrees.

### a. 1974 Covenants

Jinks first argues that ASPPPO breached Article I, § (J) of the 1974 Covenants, which, as previously discussed, sets forth the exclusive methods by which a referendum seeking to amend the 1974 Covenants can be called. Jinks maintains that because neither of the methods for calling a referendum proscribed in the 1974 Covenants were followed with respect to the Referendum called by CSA, ASPPPO violated the covenants by endorsing and promoting the Referendum.[7] At the outset, the court notes—and counsel for Jinks confirmed—that ASPPPO is not a party to the 1974 Covenants. ASPPPO cannot have breached a contract to which it is not a party, and Jinks's arguments fails for that reason alone. See Pulliam v. Clark, 2012 WL 1835717, *3 (D.S.C. May 21, 2012) (dismissing a breach of contract claim where the defendant was not a party to the contract). Moreover, the 1974 Covenants contains no provision regarding the matters that ASPPPO may endorse or promote, meaning ASPPPO did not breach the 1974 Covenants by endorsing or promoting the Referendum. Even if ASPPPO supported a call for a Referendum that was violative of the 1974 Covenants, that support cannot be construed as ASPPPO calling the Referendum itself. And if ASPPPO cannot be considered to have called the Referendum, then it cannot have violated the provisions regarding who can call the Referendum.

### b. 1988 Covenants

Jinks next argues that ASPPPO violated § 5.8 of the 1988 Covenants that limits the instances where CSA is permitted to call a referendum and, according to Jinks, makes clear that CSA's rights do not include the ability to call a referendum to amend the 1974

---

[7] ASPPPO does not dispute that it is bound by the 1974 Covenants.

Covenants.  ECF No. 38-3 at 14–15.  Jinks argues that ASPPPO, as the entity whose stated purpose in its bylaws is to "ensure compliance with all terms and conditions imposed by all . . . covenants," ECF No. 38-6 at 3, was obligated to take appropriate action including filing suit on behalf of its membership to ensure CSA's compliance with the 1988 Covenants.  Id.  The court disagrees.  Again, ASPPPO is not a party to the 1988 Covenants and therefore common-sense dictates that it cannot have violated those covenants.  Moreover, Jinks again fails to point to any provision in the 1988 Covenants that created any obligation as to ASPPPO.  ASPPPO did not violate the 1988 Covenants by failing to file suit when there is no provision in those covenants obligating ASPPPO to do so.  At best, Jinks's argument with respect to the 1988 Covenants merely asserts a violation of ASPPPO's bylaws, which is discussed below.

### c.  Bylaws

As previously mentioned, § 3.1(f) of ASPPPO's bylaws provide that ASPPPO will "[e]nsure compliance with all terms and conditions imposed by all . . . covenants . . . and other documents which affect properties within Sea Pines Plantation."[8]  ECF No. 117 at 3–4 (citing ECF No. 110-1 at 29).  Jinks argues that ASPPPO did not ensure compliance with the provision of the 1974 Covenants regarding the proper manner to call a referendum, whether by filing suit against CSA for failing to do so or otherwise. ASPPPO argues that it did not breach § 3.1(f) because there was no mandate in the bylaws to file an action against CSA or to "undertake an independent review of the legality of CSA's actions" with respect to the calling of the Referendum, as Jinks suggest.

---

[8] Jinks is a member of ASPPPO, and no party challenges her standing to sue ASPPPO for violation of its bylaws.

24

ECF No. 119 at 5.  It further argues that its decision not to file suit should be adjudicated according to the business judgment rule.  Id. at 4.  The court need not resolve whether ASPPPO was required under its bylaws to file suit or perform some other act to ensure compliance with the 1974 Covenants because, regardless, ASPPPO's actions related to the Referendum are protected by the business judgment rule.

### 2.  Business Judgment Rule

ASPPPO maintains that at the time it passed its unanimous resolution in favor of the Referendum, it believed that the Referendum was being called by the Resort just as previous referendums had been called.  When it later learned that CSA was calling the Referendum, the board members of ASPPPO determined that CSA's actions in calling the referendum were necessary and appropriate based on their previous knowledge and use of the SCNPA.  In her summary judgment briefings, Jinks generally does not dispute that ASPPPO acted in good faith or reasonably believed at the time of its resolution that the Referendum had been called with the requisite authority.[9]  Instead, Jinks argues that the business judgment rule only applies to intra vires, not ultra vires, actions taken by a board of directors.  See Fisher v. Shipyard Vill. Council of Co.-Owners, Inc., 760 S.E.2d 121, 129-30 (S.C. Ct. App. 2014) ("A homeowners association is bound to follow its covenants and bylaws and cannot defend something that violates those documents on the basis that is a reasonable alternative."); Dockside Ass'n Inc. v. Detyens, 352 S.E.2d 714, 716 (S.C. Ct. App. 1987) ("Under the business judgment rule, a court will not review the

---

[9] To the extent Jinks's arguments could be construed as so disputing, she has not presented any evidence to challenge ASPPPO's assertion and evidence that it did not know that CSA was the entity calling the Referendum at the time of its resolution or that, upon discovering that fact, it reasonably believed that CSA had authority under the SCNPA to do so.

business judgment of a corporate governing board when it acts within its authority and it acts without corrupt motives and in good faith.").

Jinks argues that ASPPPO's support of the Referendum was an ultra vires act because ASPPPO acknowledged that its approval is not required for a referendum to become effective. However, the fact that ASPPPO's approval or endorsement is not required for the amendment to be effective does not make that approval ultra vires. As a non-profit corporation, ASPPPO, under the SCNPA, "has the unbridled power to 'do all things necessary or convenient, not inconsistent with law, to further the activities and affairs of the corporation'" and these powers are "not to be narrowly construed." S.C. Code § 33-31-302 notes to 1994 amendment. Section 3.1 of ASPPPO's bylaws plainly state that it is required to "promote the common good and general welfare of Owners." ECF No. 38-6. ASPPPO's endorsement and approval of the Referendum that was designed to improve the infrastructure in the Sea Pines community falls comfortably within its requirement under its bylaws to promote the common good and welfare of the PPOs and likewise furthers the activities and affairs of ASPPPO. As ASPPPO points out, Jinks's argument would present a "Catch 22" for ASPPPO. If ASPPPO elected not to support and promote a Referendum that it felt was properly called to address the critical infrastructure problems within Sea Pines, then its members could argue that ASPPPO failed to fulfill its obligations to promote the common good and welfare of the community. Based on its bylaws and the SCNPA, the court considers ASPPPO's actions taken to support the Referendum intra vires acts subject to the business judgment rule. Because Jinks does not challenge the application of the business judgment rule except to

argue that the actions were ultra vires, the court grants summary judgment in ASPPPO's favor on the breach of contract claim.

### 3.   Ratification of any Breach

ASPPPO also argues that any breach caused by ASPPPO's approval of the amendment, or its decision not to institute any action to challenge CSA's call of the Referendum, was ratified when the PPOs overwhelmingly voted to adopt the amendment. Jinks argues that only ASPPPO's members could ratify any conduct violating its bylaws. Jinks explains that, unlike with CSA, not every property owner in the Sea Pines community is a member of ASPPPO.  Rather, membership in ASPPPO is completely voluntary, and property owners must choose to be part of that association and pay the required dues.  Jinks points out that ASPPPO has presented no evidence demonstrating how ASPPPO's members voted in the Referendum.

ASPPPO does not dispute this point, but clarifies its argument by stating that,

The ratification of the Referendum would mean that CSA did not violate those Covenants and, therefore, there could be no breach by ASPPPO in promoting and supporting it. Essentially, if Plaintiff's cause of action of breach of contract against CSA fails, then Plaintiff's cause of action for the same against ASPPPO fails.

ECF No. 126 at 8.  The court is not convinced that if the PPOs ratified any unauthorized act by CSA, it necessarily relieves ASPPPO from liability for any alleged violation of its bylaws.  In other words, if ASPPPO was obligated to ensure compliance with the covenants at issue by somehow challenging CSA's authority to call the Referendum, then its failure to do so amounts to a violation regardless of whether the PPOs later decided to retain the benefits of the Referendum call and the passed amendment.  If the PPOs ratified the call of the Referendum, that ratification does not retroactively make CSA's

actions compliant with its bylaws; it merely excuses the fact that CSA's actions were unauthorized. For any of ASPPPO's violations to likewise be excused, its own members would need to ratify its conduct. Because the court has no evidence or argument with respect to how ASPPPO members voted in the Referendum, ASPPPO cannot succeed on this defense. Nevertheless, the issue is immaterial because ASPPPO's actions are protected by the business judgment rule.

### 4. Damages

ASPPPO also argues that that Jinks cannot establish damages, the third element of breach of contract. According to ASPPPO, it is impossible for Jinks to show any potential damages caused by ASPPPO's alleged breach of contract—namely, its support for and approval of the amendment—because the Referendum could have been called without ASPPPO's approval. Jinks has not argued that ASPPPO's actions approving or endorsing the amendment impacted the call for the Referendum or the ultimate outcome of that Referendum, and without evidence on the matter, the court does not find that it presents a genuine issue of material fact. Rather than explaining how any damages flow from ASPPPO's alleged breach, Jinks argues that South Carolina law permits recovery of nominal damages in the event of breach of contract. In other words, she suggests that she need only show that ASPPPO breached a valid contract to succeed on her claim. However, the authority Jinks cites does not stand for the proposition that South Carolina courts have done away with the damages element of breach of contract causes of action. Rather, courts in cases such as Livingston v. Sims, 15 S.E.2d 770 (S.C. 1941), merely held that an action for breach of contract accrues at the time of the breach, although substantial damages are not sustained until afterward. The court has not located any case

applying South Carolina law where a plaintiff has succeeded on a breach of contract claim without evidence of damages.  Therefore, the court finds that Jinks's breach of contract claim against ASPPPO also fails because she has not submitted any evidence of damages flowing from ASPPPO's actions to support a jury finding in her favor on that element.

Because Jinks's only independent cause of action against ASPPPO—breach of contract—fails, her injunctive relief claim dies along with it.  See City of Charleston v. Joint Comm'n, 473 F. Supp. 3d 596, 632 (S.D. W. Va. 2020) ("[A]n injunction is merely a remedy flowing from the underlying substantive claims rather than an independent cause of action itself.").

### C.    Claims Against the Resort

Only Jinks's declaratory judgment and permanent injunction causes of action remain pending against the Resort.  Jinks seeks two declarations from this court as to the Resort: (1) a declaration that the Resort is not the successor in interest to the Company for the purpose of exercising any rights or privileges previously held by the Company under the 1974 Covenants; and (2) a declaration that the proposed amendment to the 1974 Covenants is unlawful, unenforceable, and invalid, and must be withdrawn in light of the material and erroneous statement of authority claimed therein, namely, that the Resort is the successor in interest to the Company.  Jinks seeks a permanent injunction enjoining the Resort from implementing, approving, executing, and/or recording the proposed amendment to the 1974 Covenants.  Essentially, in these claims, Jinks

challenges whether the Resort is the holder of the right to approve amendments to the 1974 Covenants.[10]

As previously noted, under the 1974 Covenants, a proposed amendment to the 1974 Covenants that receives a sufficient favorable vote by PPOs is subject to approval by the Company before such amendment is recorded. ECF No. 38-1 at 8 ("In the event seventy five (75%) percent of the votes actually returned to the Company or other properly appointed authority within the specified time shall be in favor of such actions, the action voted upon will be deemed to have been authorized by the Participating Property Owners; and will become effective as an amendment to these Covenants if approved by the Company.") (emphasis added). CSA sought approval of the Referendum from the Resort representative, Steve Birdwell, and the requested approval was given. At bottom, Jinks's claims against the Resort turn on whether the Resort had the right to provide that approval.

The Resort argues that it is both an assignee and successor in interest of the Company's rights, and therefore any proposed amendment approved by the PPOs is subject to its approval. Jinks does not appear to dispute that a chain of assignments from 1987, 1989, and 2007 purports to convey the right to approve covenant amendments to the Resort. See ECF No. 110-1 at 27 (arguing the Resort is "merely a third-party transferee or assignee of certain rights and obligations previously belonging to the Original Developer."). Accordingly, the court need not delve into the weeds of those

---

[10] Jinks does not assert that the Resort called the Referendum or provide any evidence that it called the Referendum. Therefore, the only issue is whether the Resort has authority to provide the necessary approval for the amendment to be recorded and effective.

documents and assignments to decide the claims against the Resort. The crux of Jinks's arguments in the summary judgment briefings is that the right to approve amendments was unassignable under the covenants and under general property law. The court disagrees.

Jinks maintains that the right to approve amendments is unassignable under the 1974 Covenants because Art. I, § J states an amendment is effective "if approved <u>by the Company</u>" and not by "the Company <u>and its assigns</u>." Jinks points out that certain other provisions in the 1974 Covenants articulate rights as those of the "the Company, its successors or assigns." <u>See, e.g.</u>, ECF No. 108-1 at Art. II, § J B(1) ("The Company, its successors or assigns, shall have the right to plant trees, plants, and shrubs"); <u>id.</u> at Art. II, § J B(4) ("The Company, its successors or assigns reserves the right on the lands . . . to locate wells, pumping stations, [etc.]"). Jinks argues that the choice to include the word "assigns" in only some provisions was intended to delineate the circumstances in which the Company's rights and responsibilities may—or may not—be assigned. However, as the Resort points out, Jinks's interpretation of the 1974 Covenants is at odds with the definition of the "Company." The "Company" is defined by the 1974 Covenants as the "Sea Pines Plantation Company, Inc., its successors and assigns, and Sea Pines Company, its subsidiaries, joint-venture partnerships and partnerships having an interest in any part of the Properties." ECF No. 108-1 at 2.[11] The express definition of the "Company" pervades every reference to the Company within the 1974 Covenants under general rules

---

[11] Jinks argues that this definition does not apply because all definitions are subject to the express caveat: "unless the context shall clearly indicate otherwise." <u>Id.</u> However, the context of the provision regarding the right to approve amendments does not clearly indicate that the definition of the "Company" does not apply.

of contract interpretation.  Accordingly, the provision in the 1974 Covenants providing

that an amendment is effective "if approved by the Company" must be interpreted as

including any successors and assigns of the Company.  The fact that some provisions

include superfluous language does not override the express definition of the word

"Company."  Applying that definition, the 1974 Covenants does not prohibit assignment

of the right to approve amendments.

Additionally, as a general rule, contract rights may be freely assigned unless there

is a provision in the contract restricting assignability.  See generally Osprey, Inc. v.

Cabana Ltd. P'ship, 532 S.E.2d 269, 277 (S.C. 2000) ("[C]ontract rights are freely

assignable today, unlike in medieval times."); Auto-Owners Ins. Co. v. Potter, 242 F.

App'x 94, 104 (4th Cir. 2007) ("Contracts are freely assignable in general; however,

contracts that expressly state they are not assignable are an exception to that general

principle."); Restatement (Second) of Contracts § 317 (1981); Am. J. Assignment § 16.

Given that the rights at issue are presumptively assignable and that the definition of "the

Company" includes assigns, the absence of the words "and its assigns" in provision at

issue cannot be considered an express statement intending to restrict the assignability of

that right.  Without such an express prohibition, the right is assignable.

In her other challenges to the assignability of the right to approve an amendment

under general property law, Jinks seems to adopt the "throw spaghetti at the wall and see

what sticks" approach.  The court only briefly addresses those arguments.  First, Jinks

perfunctorily states that the ability to assign the right to approve amendments is void as a

matter of public policy because it is too indefinite.  To support this argument, Jinks

merely asserts that "Courts do not enforce indefinite covenants."  ECF No. 118 at 13

(citing <u>Vickery v. Powell</u>, 225 S.E.2d 856 (S.C. 1976)).  The case Jinks cites simply does not stand for her proposition that the ability to assign is "indefinite" and therefore unenforceable when a contract does not state when that right to assign terminates.  If the ability to assign rights made contracts "indefinite," and contract rights are presumptively assignable, then most contracts would be considered presumptively unenforceable.  Of course, that is not the case.  The court rejects this argument.

Jinks next argues that "if the word 'assigns' in the 1974 Covenants is construed to contemplate unending possible future assignment, then it is a contingent, non-vested interest which violates the Rule Against Perpetuities."  ECF No. 118 at 13 (citing S.C. Code Ann. § 27-6-20).  The statutory rule against perpetuities has no application in this case.  To begin, Jinks fails to explain or cite any authority to show how the assignability of a contract right to approve amendments is a future interest in property that is subject to the rule against perpetuities.  Moreover, even if such an assignment is subject to the rule, it would not invalidate the assignment because any interest cannot be invalid under the rule until the expiration of the ninety-year period after the interest is created. Specifically, S.C. Code § 27-6-20(A) provides as follows:

> (A) A nonvested property interest is invalid unless:
> (1) when the interest is created, it is certain to vest or terminate no later than twenty-one years after the death of an individual then alive; or
> (2) <u>the interest either vests or terminates within ninety years after its creation</u>.

Jinks's discussion of the statutory rule against perpetuities conveniently omits the emphasized language above, which provides for a "wait and see" approach for ninety years.  The statutory rule also requires reformation of any instrument violating the rule:

> South Carolina's version of the Uniform Statutory Rule Against Perpetuities (S.C. Code Ann. § 27-6-10 et seq. (1991)) provides that a nonvested interest violates the statutory rule against perpetuities if it fails to satisfy either the common law rule against perpetuities time period or the statutory 90-year wait-and-see time period. If a nonvested interest fails to satisfy either test, section 27-6-60(B) requires that a court reform the disposition. Thus, the statutory rule against perpetuities "effectively allows three bites of the apple to a nonvested interest...." Medlin and Boyle, What Every South Carolina Lawyer Should Know About the (Ugh!) Rule Against Perpetuities, S.C. Lawyer 26, 28 (May/June 1991).

Abrams v. Templeton, 465 S.E.2d 117, 120 n.5 (S.C. Ct. App. 1995). Thus, if the 1974 Covenants' allowance of assignments violated the rule against perpetuities, then the court would not find all assignments invalid; it would limit the time period during which assignments may be made to ninety years. All the assignments at issue were made during that period and therefore would not be invalidated.

Finally, Jinks cites cases involving licenses and easements in gross to support her argument that the Company's rights under the 1974 Covenants were not capable of subsequent assignment. Again, these cases are not on point and are inapplicable to this action. A license is a "personal, revocable, and unassignable privilege, conferred either by writing or parole, to do one or more acts on land without possessing any interest therein." Paine Gayle Props., LLC v. CSX Transp., Inc., 735 S.E.2d 528, 535, n.6 (S.C. Ct. App. 2012) (quoting Main v. Thomason, 535 S.E.2d 918, 924 n.5 (S.C. 2000)). "An easement is a right given to a person to use the land of another for a specific purpose." Bundy v. Shirley, 772 S.E.2d 163, 169 (S.C. 2015). Neither the right to approve amendments nor the subsequent assignments of that right constitute a privilege to do an act on land or use the land of another for a specific purpose, and therefore they are not licenses or easements. Importantly, the bankruptcy court approved the settlement agreement in the 1986 Sea Pines bankruptcy case that specifically contemplated the

34

assignment of the Company's rights under the 1974 Covenants. See ECF No. 108-8 at 1 (agreeing to "[a]ssignment by the Trustee to Sea Pines of all rights held, owned possessed, controlled or exercisable by the Trustee, as successor in interest to Sea Pines Company, Sea Pines Plantation, Sea Pines Company, Inc., and Hilton Head Liquidation Corp. f/k/a Sea Pines Plantation Company . . . including all rights as grantor, company or declarant under various recorded and unrecorded deeds and land use covenants and declarations thereof"); id. at 4 ("It is Ordered and Adjudged that the Settlement Agreement for Final Settlement of Issues Outstanding Between Sea Pines Plantation Company, Inc. and the Trustee is hereby approved and the Trustee is directed to consummate said Agreement according to the terms thereof."). The court will not entertain a collateral attack on the validity of those approved assignments over a quarter of a century later. Charleston Cnty. Sch. Dist. v. S.C. State Ports Auth., 320 S.E.2d 727, 730 (S.C. Ct. App. 1984) ("The South Carolina Supreme Court has refused to allow collateral attacks under the guise of a declaratory judgment action upon the final judgment of a court of competent jurisdiction" (internal citation omitted)).

Overall, there is no genuine dispute that the right to approve amendments set forth in the 1974 Covenants was assignable and properly assigned to the Resort. As such, summary judgment in the Resort's favor is appropriate. Because the court resolves the claims against the Resort on this ground, the court declines to consider whether the Resort is a successor in interest to the Company and likewise has authority to approve amendments by virtue of that status.[12]

---

[12] Although Jinks seeks a declaration that the Resort is not the successor in interest to the Company and further seeks an injunction invalidating the amendment because it erroneously states that the Resort is a successor in interest to the company,

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** all defendants' motions for

summary judgment and **DENIES** Jinks's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 25, 2022**
**Charleston, South Carolina**

---

those declarations are not necessary to resolve Jinks's controversy with the Resort.  The
justiciable controversy in this case is the question of the enforceability of the amendment
imposing a $600.00 annual assessment on Jinks and other PPOs.  Having found the
amendment enforceable because the call for the Referendum was ratified and the Resort
had authority—by way of assignment—to approve the amendment, any discussion
regarding the Resort's successor in interest status is unnecessary to the disposition of the
controversy.  The court accordingly declines to exercise its discretion under the
Declaratory Judgment Act to consider that request for a declaration.  Moreover, Jinks has
not provided law or support for her argument that the amendment is invalid if it misstates
the source of the Resort's authority to approve amendments, and therefore there is no
genuine issue for trial as to that argument.